UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUZANNE SELIM,

        Plaintiff,                            Hon. Robert Holmes Bell

v.                                             Case No. 1:13-CV-928

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was 47 years of age on her alleged disability onset date. (Tr. 121). She successfully completed high school and worked previously as a pre-press operator and a newspaper and information technologist. (Tr. 19). Plaintiff applied for benefits on August 2, 2010, alleging that she had been disabled since November 9, 2009, due to anxiety and bi-polar disorder. (121-22, 157). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 50-120). On February 7, 2012, Plaintiff appeared before ALJ Janet Alaga-Gadigan with testimony being offered by Plaintiff and a vocational expert. (Tr. 26-49). In a written decision dated March 9, 2012, the ALJ determined that Plaintiff was not disabled. (Tr. 11-21). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-4). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

**RELEVANT MEDICAL HISTORY**

X-rays of Plaintiff's lumbar spine, taken January 10, 2009, revealed "minimal lumbar spine degenerative changes." (Tr. 333). On January 29, 2009, Plaintiff was examined by Dr. Thomas Watkins. (Tr. 329). X-rays of Plaintiff's lumbar spine revealed "mild osteoarthritis." (Tr. 329). X-rays of Plaintiff's left hip were "neg[ative]." (Tr. 329). Fabere test[1] was "neg[ative]" and

---

[1] FABER (or Patrick) test is "a screening test for pathology of the hip joint or sacrum." *See* Special Tests of the Lower Extremity, available at http://physicaltherapy.about.com/od/orthopedicsandpt/ss/LEspecialtests_2.htm (last visited on June 3, 2014). The test is performed by placing the patient in the supine position and then flexing one leg and placing the foot of that leg on the opposite knee. The tester then slowly presses down on the superior aspect of the tested knee joint lowering the leg into further abduction. The motion performed as part of this test is referred to as FABER - **F**lexion, **AB**duction, **E**xternal **R**otation at the hip. The results are positive if the patient experiences "pain at the hip or sacral joint, or if the leg can not lower to point of being parallel to the opposite leg." *Id.*

Plaintiff reported an "improvement in hip pain." (Tr. 329). The doctor recommended to Plaintiff that she discontinue performing aerobics and instead "go back to a traditional treadmill." (Tr. 329).

On November 9, 2009, Plaintiff was admitted to Forest View Hospital "because of problems with depression and suicidal ideation" as well as "problems with significant agitation and anxiety." (Tr. 251-61). Treatment notes revealed the following regarding Plaintiff's circumstance:

> Suzanne reports a history of depression and anxiety back to her teen years. She reports the first time she received any treatment was in her 30's. Approximately two years ago, she was diagnosed with Bipolar II. At that time, she did outpatient counseling and saw several different psychiatrists until she found the correct balance. She reports she was stable from January of 2008 until May of 2009. In May, she went to a conference in Las Vegas. It was [the] first time she had ever been to a conference and felt very overwhelmed. She had had the seasonal flu prior to leaving. While on the airplane, it was hypothesized that she caught H1N1. She was given Tamiflu on October 29th and she took six pills. She started feeling "weird" and began having hallucinations. Her PCP did have her stop the medication after six of the 10 doses. She reports her symptoms have increased over the last week. Another current stressor was that her mother-in-law passed away in August of 2009 after caring for her. Since being on the Tamiflu, she did notice that she began cutting and feeling suicidal on and off. On November 9th, she did take 4 mg of Xanax, 2 mg of Klonopin, and two shots of scotch. Her daughter called her therapist who recommended that she become inpatient to deal with her worsening symptoms. She states the reason she was admitted was because her cutting was increasing. She does report being angry and irritable, at times impulsive, impatient, and overreactive. She has purposely lost 60 pounds in the last 12 months. She does report having difficulty falling asleep and staying asleep; occasionally she will find that she sleeps too much. She does feel hopeless, helpless, worthless, and tired. She does report being anxious and can have panic attacks occasionally once a day. She does report a history of being sexually abused by her cousins when she was younger and raped by a stranger in 1986. She has been consistently taking her medications and consistently seeing her psychiatrist, Dr. Miklashek, and her therapist. Suzanne was admitted to Forest View Hospital with suicidal ideations, racing thoughts, decreased appetite.

> She was admitted to the inpatient psychiatric unit for psychiatric evaluation and treatment.

(Tr. 251-52). Treatment notes regarding Plaintiff's hospitalization revealed the following:

> Suzanne was admitted to the hospital because of problems with depression and suicidal ideation. Suzanne also has problems with significant agitation and anxiety. While in the hospital Suzanne was treated with both psychosocial and medication therapy. Psychosocial therapy consisted of individual contact, group therapy and milieu treatment. There was also an emphasis on past and present family issues. The primary areas of focus for psychosocial therapy were: (1) Dealing with Depression/Suicidality (2) Medication Compliance (3) Dealing with Emotions (4) Family Contact (5) Anxiety.
>
> Suzanne was also treated with medications while in our program: Lithium was used to treat symptoms of moodiness and depression as an augmentation to the anti-depressant medication. Seroquel was given to help sleep and to treat mood instability. Klonopin was given to treat anxiety. Clonidine was given to treat sleeplessness/over-reactivity. Xanax was used to treat anxiety. Lamictal was given to treat mood swings and irritability. Suzanne showed improvement while in our program and was discharged in improved condition to be followed on an outpatient basis.

(Tr. 258). Treatment notes also revealed the following:

> Suzanne was a part of groups and classes designed to help with depression, anxiety, and anger. Cognitive-behavioral training was provided to help foster understanding of triggers for emotional reactions, to define maladaptive responses and to find new ways to express or manage emotions. DBT skill-building was offered. There was education given regarding diagnosis and medication therapy. Suzanne was also part of daily individual counseling contact.
>
> Suzanne was able to admit problems with mood and irritability but claimed that her acute worsening had been related to taking the medication Tamiflu. The Tamiflu was discontinued and she was given medication changes. However, she reported on admission that she was actually "feeling pretty good already." She was open to suggestions for medications.

>Suzanne was felt to show positive benefit from discontinuation of the Tamiflu plus medication changes that she was given. She seemed brighter, less anxious and agitat[ed] and reported improvements in sleep. She tended to tolerate the medication quite well. Because of her improvements, she was discharged from the inpatient unit on 11/11/2009 to be part of the Partial Hospital Program.

(Tr. 257). Plaintiff was discharged from the hospital on November 13, 2009, at which point her condition was reported as follows:

>Suzanne continues to show improvement in mood, energy and emotional control. Patient claims to feel better, and seems brighter during interview. Significant dysphoria and irritability continue but are improved since admission. Patient denies suicidal ideation, denies hallucinations and delusions, and denies significant problems with medications. Patient is improved since admission.

(Tr. 259). Plaintiff was diagnosed with Bipolar II Disorder and anxiety disorder. (Tr. 259).

>Treatment notes dated April 21, 2010, indicate the following:
>
>S: Suzanne is three years post-op left total knee and she is doing absolutely great. She has no issues with her knees, she is very happy.
>
>O: At this point in time, she has full range of motion of her knee with 0 to 130 to 140 degrees of motion. X-rays revealed no radiolucencies, x-rays look perfect.

(Tr. 322).

Treatment notes dated June 4, 2010 indicate that Plaintiff "has been doing lots of cooking and baking." (Tr. 321).

On August 26, 2010, Plaintiff's husband completed a report regarding Plaintiff's activities. (Tr. 173-84). Plaintiff's husband reported that Plaintiff cleans the house, washes laundry, washes dishes, and "occasionally mows the lawn." (Tr. 179). He reported that Plaintiff also cares for their cats, shops, reads, watches television, uses the computer, and makes "craft earrings and

ornaments." (Tr. 178-81). Plaintiff completed an identical report, on the same day, providing similar answers. (Tr. 185-96).

Treatment notes dated December 20, 2010 indicate that Plaintiff's bipolar disorder was "well controlled" on her current medication regimen. (Tr. 320). Treatment notes dated December 20, 2010 indicate that Plaintiff's bipolar disorder was "stable." (Tr. 367). Treatment notes dated June 6, 2011 indicate that Plaintiff's "mood disorder" was "stable." (Tr. 366). Treatment notes dated August 12, 2011 indicate that Plaintiff's bipolar disorder was "stable." (Tr. 365).

On September 22, 2011, Plaintiff's treating psychiatrist, Dr. Gregg Miklashek, reported that "I don't believe that [Plaintiff] is capable of" performing "sustained gainful 8-hours-a-day, 5-days-a-week, on a 40-hour full-time basis type employment." (Tr. 349). The doctor further opined that Plaintiff met the criteria of Section 12.04 of the Listing of Impairments. (Tr. 347-49).

X-rays of Plaintiff's lumbar spine, taken December 22, 2011, indicate "degenerative changes and osteopenia," but "no acute findings are demonstrated." (Tr. 368). X-rays of Plaintiff's left hip, taken the same day, revealed "degenerative changes," but "no acute findings demonstrated." (Tr. 369).

On January 16, 2012, Social Worker Susan Hunt reported that Plaintiff "wouldn't be able to maintain" a full time job "due to the energy level, not focusing, she's sleeping 12 hours a day, trying to get out of bed but has been struggling in doing that." (Tr. 361).

At the administrative hearing, Plaintiff testified that she was unable to work due to "difficulty in concentrating, a lot of drowsiness and a lot of dizziness, a lot of vertigo" as well as "tremors and, yeah, a lot of problems forgetting things." (Tr. 36). Plaintiff further testified that she continues to experience "issues with depression." (Tr. 36). Plaintiff reported that she experiences

crying spells "once or twice a week." (Tr. 36-37). With respect to her medications, Plaintiff reported that she experienced numerous side effects including "forgetfulness, the dizziness, the tremors, the dry mouth really, really, really bad." (Tr. 38). When asked to describe her typical day, Plaintiff testified as follows:

> A    During the course of a typical day, my husband, the alarm clock goes off at 5:00, I get up with my husband and we have breakfast and talk and he goes to work and I go back to bed about 7:30 and lately I've been sleeping until 11:30 or thereabouts. I get up. I have lunch. I will check E-mail. I will start to clean and [then] I would like vacuum the living room and then I'd stop and take a break and sit down for awhile and then - -
>
> Q    Why do you stop and take a break?
>
> A    It's an excellent question. I just get tired. I get very, very tired just doing one thing and so I'll stop and I'll take a break and sit down and get up and do another thing. At - - David gets out of work at 4:00 and usually I will go and start dinner and dishes and then, when he gets home, we eat. He helps me clean up and then we spend our evening together, watching maybe a little TV or talking about his day.

(Tr. 39). Plaintiff also reported that she continues to suffer panic attacks. (Tr. 40).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2]  If the Commissioner can make a

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled"

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) degenerative disc disease of the lumbar spine; (2) osteoarthritis of the left hip; (3) headaches; (4) obesity; (5) ½ inch leg length discrepancy; (6) hypertension; (7) bipolar disorder; (8) major depressive disorder; (9) anxiety; (10) cutting disorder; and (11) mood disorder, , severe impairments that whether considered alone or in

---

will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13-14).

The ALJ next determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she requires an at-will sit/stand option; (2) she can never climb ladders, ropes, or scaffolds; (3) she can only occasionally stoop, crouch, kneel, or climb ramps/stairs; (4) she can frequently balance; (5) she must avoid all exposure to hazardous machinery and unprotected heights; (6) she is limited to unskilled work with an SVP rating of 1 or 2,[3] with simple, routine tasks that can be learned in approximately 30 days involving no more than simple work-related decisions with few workplace changes; and (7) she can have only occasional interaction with the general public, co-workers, and supervisors. (Tr. 14).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

---

[3] SVP ratings measure the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *See* Dictionary of Occupational Titles, Appendix C, available at http://www.occupationalinfo.org/appendxc_1.html (last visited on May 30, 2014). A job with an SVP rating of 1 corresponds to a job that a typical worker can perform after a "short demonstration only." A job with an SVP rating of 2 corresponds to a job that a typical worker can perform after "anything beyond short demonstration up to and including 1 month." *Id.*

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed in the state of Michigan approximately 5,500 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 45-48). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.      **The ALJ Properly Discounted the Opinion of Dr. Miklashek**

As noted above, Dr. Miklashek, Plaintiff's treating psychiatrist, opined that he did not believe that Plaintiff was capable of performing "sustained gainful 8-hours-a-day, 5-days-a-week, on a 40-hour full-time basis type employment." The doctor also asserted that Plaintiff met the criteria of Section 12.04 of the Listing of Impairments. The ALJ accorded "limited" weight to Dr. Miklashek's opinion. (Tr. 17-18). Plaintiff asserts that she is entitled to relief because the ALJ improperly discounted the opinions of her treating physician.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion

"is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

The ALJ discussed in detail the opinions offered by Dr. Miklashek as well as the other evidence of record. (Tr. 13-19). First, the doctor's opinion that Plaintiff is incapable of working is entitled to absolutely no deference as such is a matter reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1). As the ALJ observed, the doctor's opinions were premised on his conclusion that Plaintiff was unable to function in her position as an information technologist. (Tr. 18, 348). As the ALJ noted, Miklashek did not ever consider whether Plaintiff was capable of performing less demanding work. (Tr. 18). As the ALJ further observed, the doctor's opinions are inconsistent with the other evidence of record including the doctor's own treatment notes. (Tr. 18). Specifically, the ALJ stated:

> Dr. Miklashek's treatment notes gap a second time until October 2010, when claimant reported having problems with anxiety but her mood and affect were at the low end of the scale (1). She does not have suicidal or homicidal ideation. Her anxiety was also very low at 2. Symptoms were well-controlled on bipolar medicines but there was some concern over finding a new psychiatrist because she was losing her BCBS. However, in September 2011, Dr. Miklashek

13

> provided a sworn statement at the request of her representative. Dr. Miklashek indicated that based on his knowledge of claimant and her impairments, she meets Listing 12.04, despite his own office notes which revealed low anxiety, mood, and affect, no suicidal ideation. She meets all of category A through H. He also believes she meets at least two of the B criteria. He reports that during his treatment with claimant, she had a number of occasions of inability to function in the role as a very skilled, information technology specialist. Since she stopped working, she is somewhat improved as a result. Although Dr. Miklashek opined claimant is not capable of substantial gainful, eight-hours-a-day, five-days-a-week, and 40-hour full-time basis type employment, he was not given the opportunity to opine whether claimant could be consistent in working full-time at an unskilled job, with few workplace changes; and only occasional interaction with general public, coworkers, and supervisors. The undersigned finds that Dr. Miklashek's opinion is not well-supported by the objective and other substantial evidence of record and gives it "limited" weight. It is intrinsically inconsistent with his own office notes as well as, for example, the observations of Dr. Watkins.
>
> Indeed, claimant does require some additional health maintenance, which includes nothing more than office visits and medications. Dr. Watkins specifically stated that her temporary increase of psychological symptoms that required a two-day inpatient hospitalization was due to a medication and is now considered an allergen to her. With a short-term recovery, Dr. Watkins indicated she could return to full time duty but she chose not to, possibly because of job-related stress but certainly not due to physical restriction. Claimant has demonstrated the ability to maintain consistent medical care and compliance with treatment. Her new licensed social worker (since September 2011) endorsed she is compliant with treatment.

(Tr. 17-18).

The ALJ's rationale is supported by substantial evidence and complies with the aforementioned legal standard. In sum, the ALJ's conclusion to afford less than controlling weight to Dr. Miklashek's opinions is supported by substantial evidence.

**II.     The ALJ Properly Discounted the Opinions of Social Worker Hunt**

As previously noted, Social Worker Susan Hunt reported that Plaintiff "wouldn't be able to maintain" a full time job "due to the energy level, not focusing, she's sleeping 12 hours a day, trying to get out of bed but has been struggling in doing that." The ALJ afforded "limited" weight to Hunt's opinion. Plaintiff asserts that the ALJ failed to properly assess Hunt's opinions.

As Plaintiff recognizes, social workers are not considered acceptable medical sources, thus Hunt's opinion is entitled to no deference. *See* 20 C.F.R. § 404.1513; *Payne v. Commissioner of Social Security*, 402 Fed. Appx. 109, 118-19 (6th Cir., Nov. 18, 2010). Moreover, Hunt's opinion that Plaintiff is incapable of working is entitled to no deference as such is a matter reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1). Nevertheless, the ALJ evaluated Ms. Hunt's opinion and found that it was not supported by the medical evidence. Specifically, the ALJ stated:

> Nevertheless, Ms. Hunt, the claimant's social worker, also opined that since at least September 2011, claimant meets the criteria for Listing 12.04(a)(c)(e)(f)(g) and (B)1, 2, 3 based on the claimant sleeping all the time, not being able to concentrate and focus, and overall struggling with just maintaining her daily activities. However, such complaints are not in evidence. The medical record as a whole does not support this level of impaired functioning. Furthermore, Ms. Hunt is not an acceptable source of such medical opinion. Exhibit 10F is given limited weight.

(Tr. 18).

The ALJ's rationale is supported by substantial evidence and complies with the aforementioned legal standard. In sum, the ALJ's conclusion to afford limited weight to Social Worker Hunt's opinions is supported by substantial evidence.

**III.     The ALJ's Assessment of Plaintiff's Credibility is Supported by Substantial Evidence**

At the administrative hearing, Plaintiff testified that she was impaired to an extent far greater than the ALJ recognized and was, therefore, simply unable to work. The ALJ accorded limited weight to Plaintiff's allegations on the ground that Plaintiff's subjective allegations were "significantly inconsistent with the record." (Tr. 15). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit recently stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Commissioner of Social Security*, 540 Fed. Appx. 508, 511 (6th Cir., Oct. 4, 2013) (citation omitted).

As the ALJ observed, Plaintiff's allegations are contradicted by the evidence of record, including Plaintiff's reported activities and treatment notes indicating that when Plaintiff takes her prescribed medication she is able to function at a level far greater than alleged. (Tr. 15). The ALJ did not, however, completely reject Plaintiff's subjective allegations, noting that her RFC

17

determination "addresses demands which might exacerbate [Plaintiff's] symptomatology, as well as having considered the location, duration, frequency, and intensity of the symptomatology." (Tr. 15). The ALJ's observations and conclusions concerning Plaintiff's credibility are supported by substantial evidence and comply with the standard articulated above. In sum, the ALJ's decision to accord limited weight to Plaintiff's subjective allegations is supported by substantial evidence.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                                 Respectfully submitted,

Date: June 6, 2014                                   /s/ Ellen S. Carmody
                                                          ELLEN S. CARMODY
                                                          United States Magistrate Judge